IN THE MATTER OF THE ESTATE OF THOMAS H. BLYTHE, DECEASED.

(CASE OF "WILLIAMS HEIRS.")

(Oral Decision July 31, 1890.)

**Evidence.—Entries of Births, Deaths and Marriages in a Family Bible** are competent evidence, though such record does not contain every element in the history of each member of the family necessary to make it perfect.

**Evidence.—Experts in Determining the Authenticity of a Writing** never go beyond an inspection; they do not do as other people ordinarily do—that is, determine the handwriting, not only by inspection of the document itself, but with reference to concomitant circumstances.

**Question of Heirship.—The Evidence in this Case** reviewed and the court concludes that the next of kin are here present in the person of the Williams claimants, and so finds and determines.

Edward R. Taylor, attorney appointed by the court for certain minors named Williams, claiming to be heirs collateral.

John R. Jarboe, Ralph C. Harrison, W. S. Goodfellow, and Harvey S. Brown, for adult Williams claimants.

## WHO WAS "THOMAS H. BLYTHE?"

COFFEY, J. When was Thomas H. Blythe born, and when was Thomas Williams born? Nothing could be clearer from the evidence than the birthday and birth year of the decedent. It is true that he made several contradictory declarations about his birthplace, but the proof is that he was born at Mold, on the 30th of July, 1822; and the evidence in this case, as traced in the deposition of Sarah Roberts and others, gives an account of his childhood and youth up to the time of his leaving for California. He went to school at Mold and received an education better than others of his family; went into a draper's and grocer's shop at Ruthen, and then into a draper's shop at Denbigh, and after that into a clothier's shop at Liverpool, in which situations he obtained that instruction in business which he afterward turned to account in California. The testimony of William Williams, solicitor, Liverpool, as to the reason of Thomas Williams changing his name to Thomas Henry Blythe, because of business difficulties in which he became involved as a builder, is reasonable and credible; and the testimony of John Breeze

Roberts, although he was not called in behalf of the Williams claimants, but produced by their opponents, is yet important in corroboration of William Williams. John Breeze Roberts entered the employ of Thomas Williams in March, 1844, as a milk salesman in the Cheshire Dairy; and in this case we find the identical bill of sale from ' Thomas Williams to John Breeze Roberts, corroborating in this important point the testimony of William Williams with respect to that transaction. I think, from the evidence, that Thomas H. Blythe, or Williams, is traced from his cradle up to the time he was on the deck of the ship "Antelope," bound for America, in February, 1849.

### BLYTHE'S BUSINESS CAPACITY.

When I was considering the testimony of Andrew M. Davis this morning, counsel may have noticed that I paused when I came to Mr. Davis' sage remark concerning the boast that Mr. Blythe made as to the insignificance of his estate in San Francisco compared with his millions of acres in Mexico, and his speculative enterprises in that country. On Blythe point-ing to the map of his Mexican possessions, Davis remarked that he hoped that the map would not cost Blythe the estate in San Francisco, shrewdly intimating that the Mexican ventures would wreck the entire estate, if not arrested (as they were subsequently by the court in course of probate administration). It is a case in point with this conversation that it was a singular characteristic of Mr. Blythe that he never engaged in a business enterprise which did not turn out disastrously—as a builder at Birkenhead he failed, and so he did here in various speculations in California; and his lack of business capacity as a manager of his own property is illustrated by the improvident lease he made with the Gateleys, and his mortgage of his San Francisco property to carry on the Mexican speculation already alluded to. In that respect, in a business aspect, except for fortuitous acquirement of property on Market street, his life here was consistent with his prior life in the old country. His life here is well known up to the time he went to England in July, 1862. It is unnecessary to go over it again. The year 1863 is a most important one in this case, and the history of that year is very significant, particularly his visit to Mold. The opening

statement of Mr. Goodfellow, one of the counsel for the Williams claimants, is borne out by the testimony in the case, except in one item of it.

### THE FAMILY BIBLE.

The whole statement was supported by the evidence with one exception, and that was a slight discrepancy or disparity which was commented on with great stress and force by opposing counsel. Mr. Goodfellow announced that they had here a family Bible which, of course, was evidence of the highest dignity—a family record of the births, deaths, and marriages. There was a slight discrepancy between statement and proof, which Mr. Goodfellow in his argument endeavored unnecessarily to reconcile. It was a family record, even though it did not contain every element in the history of each member of the family which was necessary to constitute it a perfect one.

### THE PARCHMENT DEED.

It was on the visit to Mold, in 1863, that the parchment deed from Thomas to his brother Charles Williams was executed, the signature, Thomas Williams, being in the handwriting of Blythe. It was unnecessary to prove that by expert evidence; it is one of those things which proves itself, notwithstanding it was shown that people can write on the spot a letter made to order, and manuscripts that will defy ordinary detection as false. That has been shown. Of course Mr. Gumpel did demonstrate that. Mr. Gumpel can demonstrate anything in the way of handwriting. The circumstances of that deed are entirely consistent with the deed—besides the fact proved that it was the signature and the act of Thomas H. Blythe.

The letters which have been introduced on behalf of the Williams claimants are beyond any question, in the judgment of the court, genuine; and the court's judgment at this time, after great reflection and listening to all the evidence, and after as minute an examination as the experts even have given to them, without possessing their capacity of simulation, verifies the very first impression that these documents were genuine—that is, upon inspection, when originally produced in court. The experts in determining the authenticity

of a writing never go beyond an inspection. An expert does not do as other people do, or as ordinary people do: determine the handwriting not only by inspection of the document itself, but with reference to concomitant circumstances; and if these writings did not contain internal evidence of their own genuineness, these circumstances would establish their authenticity.

### THE PARIS LETTER.

The Paris letter to Kyffin Jones, October 19, 1872; Exhibit W. W. No. 2, London, August 26, 1863; Exhibit C. J. D. No. 2, London, August 26, 1863, "P. S. My address in Paris is intended for yourself only. T. W." That is a very important factor in connection with other matters, and the court has not attempted to exaggerate the importance of it. Exhibit C. J. D. No. 4, Exeter Hall Hotel, Strand, London, Wednesday, 11 A. M., "Please address as above, and consider the address as strictly confidential, and in future, should you permit it, I shall request all my friends in Liverpool and vicinity to direct any communication they might have for me to your care, to be forwarded to me at your request. Thomas H. Williams." That, taken in connection with the banker's testimony, shows that Thomas H. Blythe was there at that time, and that he kept that bank account at Monroe's Bank; the bookkeeper proves to a demonstration that at that very time this man Thomas Williams was visiting Paris and holding himself out there as Thomas H. Blythe.

### THE VISIT TO CHESTER.

The visit to Chester of August, 1870, is important. The testimony of Thomas Williams, one of the claimants, must be taken as probable. His testimony seems probable in connection with that visit to Chester in August, 1870 (see page 368, volume 4, judge's manuscript notes), and the Exhibit W. W. No. 4, the Chicago letter, which is a most important contribution to the literature in this case, and is in itself sufficient to substantiate the allegation of the claim of the Williams claimants.

### THE CHICAGO LETTER.

This Chicago letter is indubitably authentic. This letter on its face, at the very moment I saw it, apart from extrane-

ous circumstances, seemed to me to be a genuine emanation. It was received by the witness, Thomas Williams, claimant, through the postoffice, September 19, 1870. Now, we have the letter, Williams' Exhibit W. W. No. 5, Thomas Williams to John Williams, no date, blue note paper, and W. W. No. 6, envelope superscribed "John S. Williams," in Blythe's handwriting, the same as in the letter, ink the same. There was a very ingenious endeavor on the part of counsel, Mr. Towle, to show that the superscription and handwriting in the letter were different. Nobody but Mr. Towle, and perhaps Mr. Gumpel, could see the difference. The court did not.

### THE THIRD VISIT OF BLYTHE TO EUROPE.

Then we have the third visit of Blythe to Europe in 1872, in connection with which there is important evidence. W. W. No. 7, letter to "Dear Charles," Liverpool, no date, written on Washington Hotel paper, was written on a portion of a whole sheet, a part of which was devoted to another letter. Blythe was at Mold from September 5 to 9, 1872, with the exception of a flying visit to Chester. W. W. No. 8, agreement to assign by Sarah Roberts, filled in with writing claimed to be in Blythe's hand, unexecuted, and Exhibit W. W. No. 9, application for annuity, filled in by Williams, or Blythe, were done on this third visit. That was beyond question given by Thomas H. Blythe in the name of Williams; that was when he was masquerading, so to speak, in his true name. The testimony of Thomas Williams, claimant, as to the relative height of himself and his uncle Thomas, at the time of the latter's visit, August, 1872, was corroborated afterward in the course of this trial by the safe deposit book. The letter W. W. No. 7, Liverpool, Monday, "My dear Charles," is a letter which, when compared with the letter to Dr. S. F. Elliott, Williams Exhibit 62, Liverpool, August 23, 1872 (Washington Hotel letter) appears to have been written on the same hotel paper as the latter. There was an endeavor here, and it was partly successful, to show that you can manufacture a paper or writing to order. Of course, that can be done; but the letters upon comparison will speak for themselves. These things cannot be done so deftly that an imposition of that kind, in connection with the rest of it, can be practiced successfully. If this be a

fraud, of course all of these are parts of one stupendous whole. If so, they are executed with almost superhuman ability and skill. In the deposition of Deacon Griffith of Mold, and of Annie Hughes Morris, sister of Kyffin Jones, are contained much matter of importance. The deposition of the deacon goes to this remarkable circumstance, that a stranger from America should contribute a larger coin that was customary to be put in the box; and Annie Hughes Morris relates a conversation about an annuity for Sarah Roberts, at the Mold visit, August, 1872.

### BLYTHE'S PROVISION FOR HIS KINDRED.

There is a point in which Counsel, former Judge Boalt, secured a very strong hold on Counsel Dr. Taylor about the contribution to the young woman Florence. Mr. Blythe was not a very generous provider for his own kin, but I suppose we could account for the relief extended by him to the indigent Sarah Roberts, an inmate of the poorhouse, for the same reason that he endeavored to account, but with a less degree of reason, for his contributions to the support and education and maintenance of Florence Blythe. She had other sources of support, but poor Sarah seemed to be dependent entirely upon Tom, and he out of his abundance made this provision for an annuity, which was a choice between the outside and inside of a poorhouse. The counsel passed this by without remark. It was a very meager pittance. Nevertheless this meagerness does not disprove the relation of the parties, because it very frequently happens that rich men do not wish their poor relations to know of their prosperity, and therefore they make scant allowances, and in this case there was a very good reason for it. Mr. Blythe's own declaration was that it would turn the heads of these people if they ever knew how wealthy he was; therefore, he did not bestow largely of his bounty upon them. I think it was a wise resolve, looked at from a worldly point of view.

### THE PHOTOGRAPHS IN EVIDENCE.

The Kyffin Jones letter, dated October 19, 1872, from Paris, in which "*Thomas Williams*" inclosed four photographs, "one for your mother, one for Miss Annie, one for

sister Sarah and one for yourself," is here with two of the inclosed photographs, and leaves nothing to be desired as absolute proof of the case of the Williams claimants to heirship. Take those photographs, "S. R. 1" and "Annie Hughes Morris' Exhibit A," and you will find the same photographer's mark and ink-written number on the back, "Cliche, No. 12,794," which you will find on "Wright's Exhibit No. 1," produced by the attorney John A. Wright, which was produced after the opening of the depositions, and same as "A. E. B.'s Exhibits F4 and K4," produced in like manner by the defendant Alice Edith Blythe. Those photographs are remarkable. I do not think that there is any feature in this case which furnishes such strong evidence of the genuineness of the claim of the Williamses to be the collateral heirs as these photographs. If there is anything in the case which would emphasize the truth of this remark, it is the fact that in the case of the "Gypsy Blythes" the Scotch case, so-called—the little photograph was said to have been given to the Gypsy Queen. I think the Gypsy Queen is disposed of; but in this connection it did not need the evidence of photographer Stateler and his partner to prove that that little photograph was a copy of the Paris photograph. It, as in the other case, proves itself. They would knock out the spots, as far as they could, on the face of the negative. There was a resolute, stubborn endeavor on the part of photographer Watkins, called by the counsel for the "Gypsy Blythes," to accomplish the purpose, in which he was aided and abetted by Mr. Burke Holladay most worthily and ably, but without success. These photographs were taken previously, and they came from that man "Thomas Williams," who in 1863 wanted his Paris address to be confidentially kept, and he was the same "Thomas H. Blythe" who was in Paris in 1872, at the time the photographs were taken and sent to Kyffin Jones. They are his pictures, and they have marks of identity, notwithstanding the endeavor of Counsel Towle to show that one of those pictures, by reason of a little variation of the ink, was not a genuine one. Mr. Towle's endeavor was, as I said in the same connection before, ingenious, but it was not satisfactory to the court. The court looked with its own eyes at the same picture and

the same indorsements, and saw identities that could not have been fabricated in any way. Besides, observe the sources from which they came; some of them were produced before the depositions were offered and before these people or anybody else had a chance to make a simulation.

## THE PERSONALITY OF THE CLAIMANTS.

Now, with regard to these men, the Williams claimants. There has been a great deal of animadversion upon different witnesses in this case and the different claimants, which the court has striven to avoid noticing, because I assume that all the persons who have come in as claimants have come in good faith and with a desire, at least, to demonstrate the truth of their pretensions. Some of them have come, perhaps, a little in doubt, but anxious to find out where the truth lay and to be satisfied with the result even though they were unsuccessful. There is one thing in this case—the Williams case: The personality of these claimants. This man John Williams, for instance, impressed the court favorably; he told a plain, straight story, and he looked like a man who was in the habit of telling the truth. He has not been long enough in this country to acquire any other habit, perhaps, but all of them looked like what they claimed to be, honest and intelligent men, who are habitual church-goers, and who regularly attend to what duties were enjoined upon them by their religion. It struck me that there was no affectation about them; that they were sincere and straightforward men, and imbued with a religious sense; and, as counsel for these claimants said, that accounts for what was otherwise unaccounted for. It is the only case among all the cases that so accounts for that "devotional Deism," as it is described in that pious letter of Blythe to old Mr. Perry.

There is not a streak of religion in Mr. Blythe except that shown in the Welsh case. That accounts for the religious strain that occasionally cropped out in Thomas H. Blythe. He got his religion from Wales, where, as Alice Edith Blythe said, he heard beautiful sermons, prayers rather, and such nice, such fine hymns, which struck him particularly because "they seemed to come from the soul." That is the very strongest evidence. He himself said, as is shown elsewhere

in evidence, that in his youth he was accustomed to hearing hymns.

### THE CHARACTER OF WILLIAM WILLIAMS, THE LIVERPOOL SOLICITOR.

Now, there was an endeavor on the part of the opposition to this claim to discredit the testimony of William Williams, the solicitor, but I do not think it was justified by the facts. He is not at all a lovable character, but in regard to this case his statements are borne out by the general force of the evidence; and John Williams, claimant, struck the key-note, as counsel suggested, of the character of William Williams, when he related the result of his interview upon going to his office to inquire about the White street property, when William Williams said to him, "Your uncle was a bankrupt, ran away to avoid arrest, and was a damned scamp"; and then John Williams, when he returned home, laughed and said he had paid eight and sixpence to hear his uncle called a damned scamp.

William Williams is a crabbed man, close and penurious, likely to make enemies, of unyielding disposition and naturally of a litigious disposition; but apart from that he is corroborated, and in various respects. His statement about Blythe's being at the Washington Hotel on August 23, 1872, and that he did business with him at that time under the name of Williams, is corroborated as to the former, and is evidenced as to the latter, by the extracts from the entries in his office call-book. William Williams is evidently a very exact and methodical man, of most minute observation, and on that very day Blythe wrote to Elliott the Washington letter. It is incredible that William Williams' statement could be false in view of this corroborating letter, of the contents of which he knew nothing, nor of its existence. In other respects he is also corroborated, particularly as to the birthmarks on the face of Blythe. This picture of the corpse shows that. The photographer Stateler testifies that there were spots there, although not perceptible even to those who were intimate with him, because the defendant Alice Edith Blythe testified that she did not see any spots or did not observe any; and we had no evidence here except in the

deposition of Dr. Charles Montgomery Wilkins, that interesting gentleman who testified by deposition, and who said something as to his operating on them with nitric acid. He called them warts, not birthmarks. What took place between John Williams claimant, and William Williams, solicitor, on April 9, 1883, before either had heard of the death of Thomas H. Blythe, is a very important circumstance and startling in its corroboration. On April 9th, in the ordinary course of events, they would not have known of the death of Blythe and the circumstances of his death. The fact was not known to the people in Liverpool on the 9th of April, although of course it might have been known, just as somebody else might have been the father of Florence Blythe by Julia Ashcroft or Julia Perry; it might have been, but it was not. So here, neither knew at the time of the death of Mr. Blythe, when the solicitor told him that his uncle Thomas had gone to America under the name of Blythe (see page 378 of the judge's manuscript notes, volume 4). I have before me the official stenographer's transcript of the testimony of John Williams, which is not necessary to go over. The evidence here is as strong as evidence can be that William Williams did not know of the death of Blythe at the time of that interview, but first learned of it on the 19th of April, 1883, from an advertisement in the Liverpool "Mercury," and the very next day he gave his information to the advertiser, Dr. Hood. The great point on the photographs is their identity with the original, and on this subject a comparison may be made of the photographs of Elizabeth Powell, "Williams' Exhibits 73 to 76," taken after death, and the photographs of Thomas H. Blythe taken after death, "Williams' Exhibits 63 to 66." These are matters of resemblance, and are of frequent occurrence.

## THE NATIONALITY OF THOMAS H. BLYTHE.

As to the nationality of Thomas H. Blythe, it is clearly established that he was a Welshman. The testimony of Thomas Dain as to the conversation with him shows the declaration of Blythe, also Rev. Aaron Williams, the venerable pioneer clergyman. He has been here since 1849, and in his profession his reputation is high. I think that he told the

truth, and it was a perfectly natural story that he told about walking up Market street. On his way he saw this man, the decedent Blythe, with his dog there in front of his office; and he said this great thought occurred to him, and he preached a little sermon and gave the text to Thomas H. Blythe: "If every man loved his God as this dog loves his master, what a blessed world it would be"; which is characteristic and true. His statement and comparison of statements, about being of a common religion and a common race, and the relation about these matters, about the place and the neighborhood of Mold and the old schoolhouse, and that sort of thing, are certainly facts Blythe could not have known at that time and have related them to this man, who was familiar, as he said on the stand, more so, perhaps, than with some of the places in San Francisco, where he had been for the last forty years. Blythe could not, even with his propensity for romancing, have invented all these details about those places, unless he had been there, nor could his memory have gone to those years and circumstances unless he had been there at the time; and therefore I was very greatly impressed with the strength of the testimony of the Rev. Aaron Williams. Whatever may be said of other witnesses and of some of these cases, the Rev. Aaron Williams has character and reputation; as a citizen in this community he stands high, and is honored in vocation. It was not suggested on any side that he was inventing his testimony as he went along.

Reese Llewellyn is to a less extent in the same situation as Mr. Williams, his calling is different, but his rating as a business man is excellent, and his veracity is unquestioned. Mr. Llewellyn testified as to the Welsh dialects and the difference in the dialects. He thought that Mr. Blythe spoke the Welsh dialect of North Wales and was a North Welshman. Mr. Llewellyn came from the other section. Mr. E. W. Jones is a Welshman, and a man whose credit is not impugned; he corroborates Llewellyn. These two gentlemen are entitled to be considered as supporting the allegation that Blythe was a native of Wales; with reference to the Rev. Aaron Williams, he did not speak to Mr. Blythe in Welsh, and said on the stand he was very sorry he had not

done so; but he did have sufficient colloquial discourse with him to show that they came from the same place.

Sarah Roberts' testimony as to her brother Tom's broken leg, broken early in life, when he was six or seven years old, when he was going to the works, seems to be supported by the testimony of Alice Edith Blythe, who makes a statement about Blythe's fractured limb. In the judgment of the court, the evidence is conclusive as to nationality.

## THE LETTERS IN EVIDENCE.

As to the genuineness of these documents, the letters: These letters are established as authentic, in my opinion, apart from the evidence of the experts, Hickox, Hyde, Grant, and Schmidt. Only two of these were actual experts in the professional sense—Hickox and Hyde—and they show, so far as this class of testimony can show, that these letters were not fabricated or forged. But when we go over these letters and examine each with its concomitant circumstances (the great variety of these letters and the nature of their contents, the circumstances existing at the dates of their writing, their early production for inspection and examination, so early as May, 1883.), the theory that these letters were concocted and forged by William Williams, solicitor, cannot but be deemed as utterly improbable. The tracings of Gumpel prove, as I have already said, nothing as to the facility of fabrication that was not already known; books of biography and history are full of fac-similes made by tracing; but the task of fabricating the documents in this case is so formidable as to be simply insurmountable. As to Mr. Gumpel, I do not care to indulge in any criticism at all, but I do not regard Mr. Gumpel as an expert in the sense of detecting a false writing from a true one. He is a very clever calligrapher, but he is not a student of handwriting. This is shown in his testimony. He comes upon the witness-stand and jumps at a conclusion at once. What is the conclusion? A document is placed before him. Is that true or false? It is false. Why? Then he proceeds to show it. First he will say, by showing that a man wrote something like that—illustrating on the blackboard. I was not satisfied as much with his testimony as I was with other professional experts, largely, as I have

said, because of the way in which he leaps at a conclusion. As one of the counsel said, Mr. Gumpel seems to have a mania for denouncing all writings submitted to him as forgeries, and the court has preserved the record of some cases in court which would appear to justify this remark. Mr. Gumpel said the signature "Thomas Williams" was not made by Blythe because of the angularity of the letters and the formation and connection of the "Th" in "Thomas" in the parchment deed; that "C. J. D., 1," is not like any genuine writing of Thomas H. Blythe; that the "h" is too tall, relatively higher to the "T" than in his own writing; but this is disproved by the "Paris Wheaton letter," which is angular throughout, and the "Th" in the signature is precisely like the "Th" in the parchment deed in formation and connection and relative height. The "Thomas" in the Pioneer record is exactly the third signature "Thomas" in the bill of sale. That is strictly so. This proves that the signatures in the parchment deed and the bill of sale were made by Blythe. Gumpel testifies that the Liverpool-no-date letter was not in Blythe's handwriting; that it was doubtful. He had a doubt because of the stiffness of the figure "7" in the body of the letter; yet the court in its own handwriting had written figures precisely like that which he undertook to discredit—made at the moment, from day to day, and which were taken from the notes of the court, made precisely like the one which he considered a characteristic of Blythe's "7." Again, Mr. Gumpel said that Blythe never wrote his "J's" below the line. This is not invariably so. In fifty-two of his letters to Carr he so wrote his "J's." Gumpel said that in Blythe's handwriting roundness and not angularity predominates, whereas the contrary seems to be the fact in most cases, although there is an example of a letter written in a strange hand. Perhaps that letter to Florence, the first letter to her, shows that he was quite capable of writing a round hand, and a number of those letters are written in a round hand, but most of his letters are in angular hand.

The Chicago letter, "W. W. No. 4," September 1, 1870, is genuine beyond any question, and this case could almost stand upon that letter, if not entirely stand upon it, and Gumpel does not testify against it. It is indisputable, al-

though it is not undisputed, and of itself alone is almost sufficient to establish the case of the Williams claimants so far as handwriting is concerned.

There are no less than three important documents established beyond question in the judgment of the court: one, the Chicago letter, "Exhibit W. W. No. 4"; the envelope addressed to Mr. John. S. Williams, 19 *Parkerfield Terrace*, Birkenhead, containing the letter beginning "My dear John," written with blue ink on blue paper; and the "Dear John" blue letter envelope, postmarked "Liverpool, 20th Aug. '70." Compare the exemplar—the Haskell letter of date New York, July 29, '62—with the "Paris-Wheaton letter" and the "Dear Charles" letter of August 26, 1863, and the "Dear John letter" of London, August 26, 1863, and the characteristics are all alike, and all made by the same person, Thomas H. Blythe, as he was known here.

### EXPERT EVIDENCE GENERALLY CONSIDERED.

Now, with reference to expert evidence, I desire to say nothing at all in depreciation of Mr. Gumpel, but assume that he is to the fullest extent as great an expert, as reliable a person, and as skillful an artist with the pen, as the counsel introducing him maintained, but he is only one, and there are four on the other side. Two of them are bank clerks, accustomed to inspect signatures on checks; but bank clerks or tellers, who daily look at checks, pass them principally because of their familiarity with the particular signatures which they have always before their minds, and hence they do not serve any great purpose in testifying upon signatures with which they have no real familiarity or actual daily contact. I have noticed this with reference to some of them, because I have seen them on the witness-stand affirm or deny signatures with the greatest quickness, almost equal to that of Mr. Gumpel, and yet not be correct in their conclusion. But there are two real experts as against Mr. Gumpel—two persons who are so considered in the community, and who have come into court twenty or thirty years, or more, whose opinions are contrary to that of Mr. Gumpel. As to a question of evidence, or legal value, there are two to one. The envelopes, "C. J. D. 3 and 5," addressed "Mr. Drewe, Messrs.

Drewe and Sergeantson, attorneys, Castle street, Liverpool,'' and the letters contained in them, went through the mail, and were undeniably the product of the pen of Blythe, and could not have been in the circumstances fabricated. Now, we come to a place where Mr. Gumpel testifies with great positiveness—as to the letter to Kyffin Jones, dated Grand Hotel, Paris, October 19th, 1872, of which Mr. Gumpel says that he does not think that the body or signature of that letter is in the writing of Blythe, because it is labored and written with prepared ink. This statement is destroyed when we compare this letter with any of the Elliot letters from Paris, the same characteristics being observable in all of them; take, for example, "Williams' Exhibit 43," 10 Nothingham Place, August 22, 1873, and compare it with the Kyffin Jones letter. This letter is proved scientifically. It is traced right to its source, and is free of all doubt; besides, a comparison of the undisputed letters from Blythe to Carr with the disputed letters shows similarities which are very striking. The identities are all in contradiction of Gumpel, and the comparison which has been made here. demonstrates beyond any doubt that the same hand wrote each and all of them. That was strongly borne out by the illustrations of Mr. Hyde, when he endeavored by a scientific process to demonstrate the theory opposed to Mr. Gumpel. Now, there is another proposition, and I adverted to it this morning, which runs through these letters, and runs all through the correspondence of Blythe; the characteristics of his orthography in the admittedly authentic letters and the singular eccentricities in the disputed letters, the Williams exhibits; and sometimes from a very small fact one may properly draw a large and correct inference. There is one extremely eccentric instance of spelling, "*occation*" in the "Dear Charles letter" of London, August 26, 1863, and the same word in the Haskell letter, New York, July 29, 1862, "*occation*." Here we have the same word misspelled in the same way, and that way a singularly eccentric one.

This man has been traced all the way through in his writings, from the earliest letter here produced to the latest, and his identity and the authenticity of the Williams exhibits have been established beyond any possible doubt. The same

man that wrote the Haskell letter of 1862 wrote the Williams letters. This is demonstrated in every way, by identities of handwritings, the eccentricities of spelling and grammar, and many other eccentricities; the identities might be multiplied in the course of the correspondence, extending over a period of nearly twenty years, and the inference from these identities is irresistible. As Counsel Towle said at the commencement of the case of the collateral heirs, the heirs of Blythe must be in this courtroom here now; some of the claimants here present must be next of kin; and the court believes that the next of kin are here present in the person of the Williams claimants, and so finds and determines.